J. Frank CURRY and Daniel R. Farnell, Sr., on Behalf of themselves and all others similarly stated, Plaintiffs-Appellees,

v.

John BAKER, as Chairman of the Alabama State Democratic Executive Committee; and the Alabama State Democratic Executive Committee, Defendants-Appellants,

William J. Baxley, Jerry Henderson, Dejerilynn Henderson, Charles Kennith Pike & Nellie Kent Pike, Defendant Intervenors-Appellants,

Charles D. GRADDICK, Plaintiff-Appellee,

v.

John BAKER, as Chairman of the State Democratic Executive Committee, and the State Democratic Executive Committee, Defendants-Appellants,

Jerry Henderson, Dejerilynn Henderson and William J. Baxley, Defendant Intervenors-Appellants.

No. 86–7639.

United States Court of Appeals, Eleventh Circuit.

Oct. 1, 1986.

---

Jack Drake, Drake, Knowles & Pierce, Ralph I. Knowles, Jr., Tuscaloosa, Ala., Neil Bradley, American Civ. Liberties Union Foundation Inc., Laughlin McDonald, Paula E. Bonds, Atlanta, Ga., Joe Espy, III, Montgomery, Ala., Edward Still, Birmingham, Ala., Herman Watson, Jr., Watson, Gammons & Fees, Michael L. Fees, Huntsville, Ala., David Cromwell Johnson, Birmingham, Ala., for defendants-appellants.

Walter J. Sears, III, Bradley, Arant, Rose & White, Hobart A. McWhorter, Birmingham, Ala., Champ Lyons, Jr., Coale, Helmsing, Lyons & Sims, Mobile, Ala., David B. Ellis, Tuscaloosa, Ala., Barry Sullivan, Joel T. Pelz, Chicago, Ill., for plaintiffs-appellees.

Before GODBOLD, VANCE and JOHNSON, Circuit Judges.

GODBOLD, Circuit Judge:

This court has before it for appellate review the latest trial court ruling concerning the 1986 gubernatorial primary of the Alabama Democratic Party. Subject to specific exceptions, federal courts should not be involved in settling state election

disputes. Sound reasons grounded in both law and public policy establish that far better forums for disputes involving elections to state offices are found in the party machinery and the court system of the affected state. We follow that policy here.

The defendants appeal from a judgment of the United States District Court for the Northern District of Alabama in consolidated cases brought under 42 U.S.C. § 1983. One case is brought by Attorney General Charles A. Graddick, a candidate for the Democratic nomination for governor. The other case is filed by two of Mr. Graddick's supporters, J. Frank Curry and Daniel R. Farnell, Sr. Section 1983 is the federal statute under which a citizen may bring suit in a federal court, alleging that persons acting under color of state law have deprived him or her of rights secured by the Constitution of the United States.

Plaintiffs alleged in their complaints that an election contest of the Democratic runoff primary, which contest resulted in the Democratic Party's nomination of Lt. Gov. William J. Baxley as its candidate for governor, deprived them of due process and equal protection of the laws as guaranteed by the Constitution of the United States. The district court held that the party subcommittee that heard the contest had violated due process, and on September 18, 1986 it ordered the Democratic Party to conduct a new runoff primary. This appeal followed.

On motion of appellants the district court's injunction was stayed and the case expedited. Briefs from all parties were received September 24, and oral argument was heard by the court in Montgomery, Alabama on September 25.

## I.

### THE CENTRAL ISSUE, THE FACTUAL BACKGROUND, AND THE PROCEEDINGS TO DATE

#### A. *The Origin of the Controversy.*

In the Democratic primary conducted June 3, 1986 no candidate for the Party's nomination to run for governor in the general election in November 1986 received a majority. It was thus necessary that the Democratic Party conduct a runoff primary. In the Democratic primary runoff, held June 24, massive illegal "crossover voting" occurred. In the context of this case "crossover voting" means that persons who had voted in the Republican primary (also conducted on June 3), where they either voted for, or had the opportunity to vote for, a Republican nominee to run for governor in the November election, "crossed over" and voted in the Democratic runoff primary on June 24 and thereby participated in the Democratic Party's choice of its nominee for governor to run in the general election in November. In short, "crossover voters" participated in the choices by two political parties of their respective party nominees for governor to run against each other in the same general election.

A tabulation of all *legal and illegal* votes in the Democratic runoff resulted in totals of 470,051 for Mr. Graddick and 461,295 for Mr. Baxley, a difference of 8,756 votes. In a contest filed before the State Democratic Executive Committee Mr. Baxley contended that Mr. Graddick was guilty of election fraud and that Mr. Baxley received a majority of the legal votes cast. The Democratic Party found that Mr. Graddick had committed flagrant violations of federal and state law and certified Mr. Baxley as its nominee for the general election.

Unless this appeal is decided on issues arising before the merits are reached, the central issue before this court concerns the methods and the evidence used by the contest subcommittee in determining that Mr. Baxley received a majority of the legal votes cast and, as a result, in certifying him as the nominee of the Democratic Party.

#### B. *The Rule Against Crossover Voting.*

Pursuant to statutory authority, Ala. Code § 17–16–14 (1975), on April 21, 1979 the State Democratic Executive Committee adopted the following rule, which now ap-

pears as Article VII, § 1(e) of the Party's rules:

> Any person who (1) votes in any primary election of another political party, (2) participates in the nominating process of another party's candidate(s), or (3) promotes the candidacy of an independent candidate, shall not be entitled to vote in Primary Elections of the Democratic Party held in the calendar year in which such person does any of said prohibited act(s). Without limiting the foregoing, *any person who votes in the first primary election of another political party shall not be entitled to vote in the Democratic Party's run-off Primary Election* which follows such first primary election. (emphasis added)

This provision has the force and effect of law. Ala.Code § 17–16–14. The rule was submitted to the Attorney General of the United States and in 1980 was precleared by him under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c. As discussed below, plaintiffs do not contend in this court that this rule of the Democratic Party is invalid.[1] Rather they object to the manner in which the contest subcommittee decided the contest.

### C. *Violation of the Rule.*

During the runoff campaign (the period between the June 3 Democratic primary and the June 24 Democratic runoff), Mr. Graddick openly solicited crossover voters. His opponent, Mr. Baxley, publicly contended that those who had voted in the June 3 Republican primary should not and could not vote in the Democratic runoff primary. On the day before the election a Mobile attorney representing Mr. Graddick went before a state judge in Mobile seeking a temporary injunction against interference by election officials with crossover voting. He obtained an order setting the matter for hearing. Included in the order, drafted by the attorney, was an "admonition" to election officials that if they impeded the exercise of the right to vote based upon the Rules of the Alabama Democratic Party they could not escape personal liability if the court later found the Rules invalid. The order was widely publicized.

On election eve Mr. Graddick caused a letter to be issued on the state Attorney General's letterhead, signed by the Chief of the Voter Fraud Division of his office, warning all election officials against attempts to enforce the rule against crossover voting and threatening that any such attempt could subject such officials to liability. The letter was hand delivered throughout the state by Mr. Graddick's campaign workers.

Four Republican state senators, the highest elected Republican state officials in Alabama, joined in the effort to encourage crossover voting through television advertisements calculated to assure persons who had voted in the June 3 primary that they could properly cross over and legally vote for Mr. Graddick. The Republican chairman of Madison County sent out 5,000 letters to persons in the Huntsville area soliciting votes for Mr. Graddick and made a publicized statement that it was "the responsibility of *every* citizen to vote in [the Democratic] runoff."

Approximately 14,168[2] persons who had voted in the June 3 Republican primary

---

**1.** The right of a political party to protect itself from intrusion is long recognized. Under a closed primary system in which only enrolled members of a party may vote in that party's primary, the Supreme Court has described as "raiding" the actions of voters in sympathy with one party in designating themselves as voters of another party so as to influence or determine the result of the other party's primary. *Rosario v. Rockefeller,* 410 U.S. 752, 760–62 n. 10, 93 S.Ct. 1245, 1252 n. 10, 36 L.Ed.2d 1 (1973). In *Ray v. Blair,* 343 U.S. 214, 72 S.Ct. 654, 96 L.Ed. 894 (1952), the Supreme Court upheld the right of the Democratic Party of Alabama to require a candidate running in the Democratic primary for presidential elector to pledge to aid and support the nominee of the Democratic National Convention for president and vice president. The Court referred to the pledge as "a provision [that] protects a party from intrusion by those with adverse political principles." *Id.* at 221–22, 72 S.Ct. at 657.

**2.** The determination of this number is discussed *infra.*

crossed over and voted in the June 24 Democratic runoff.

### D. *The Alabama Contest Mechanism.*

Alabama statutes commit to the state executive committees of the political parties the responsibility and authority to conduct primary election contests. Ala.Code §§ 17–16–70 through 17–16–89. In discharging that responsibility the party committee exercises powers "such as those conferred on a court of special and limited jurisdiction." *Boyd v. Garrison,* 246 Ala. 122, 19 So.2d 385, 388 (1944). The statute provides for the issuance, through the clerk of the circuit court, of subpoenas and orders for production of documents and commissions for taking of depositions, as required by either party to the contest or by the party chairman. § 17–16–84.

The state party chairman is empowered to appoint a subcommittee to hear and decide any contest. § 17–16–82(c). That was done in this case.

Under Ala.Code § 17–16–72 the contestant's burden is to *reasonably satisfy* the contest committee that the apparent winner of the primary did not receive the required number of legal votes. The committee is then specifically empowered to declare the legal nominee. A new primary may be directed only if it is *impossible* for the committee to determine the legal nominee. Ala.Code § 17–16–87.

An appeal lies from the contest subcommittee to the party's state executive committee, "which shall be the court of final appeal in all party contests." Ala.Code § 17–16–87; *Ex parte Charles A. Graddick,* 495 So.2d 1367 (Ala.1986). There is no statutory right of appeal to the state courts. *Id.*

### E. *The Baxley-Graddick Contest.*

The contest at issue was processed under the statutory provisions outlined above. Discovery was had, hearings were held by the subcommittee, and evidence was received.

The contest subcommittee had before it votes, legal and illegal, in the numbers of 470,051 for Mr. Graddick and 461,295 for Mr. Baxley. It received evidence concerning the activities of Mr. Graddick in soliciting and encouraging crossover votes and in issuing directives as Attorney General of Alabama to voting officials requiring that they allow crossover votes. It had before it the findings, conclusions and judgment of the three-judge district court in *Henderson v. Graddick,* 641 F.Supp. 1192 (M.D. Ala.1986). As described more fully below, *Henderson* was a case brought in the United States District Court for the Middle District of Alabama, in which it was contended that Mr. Graddick violated the Voting Rights Act, 42 U.S.C. § 1973c, by using his office to encourage the violation of the Democratic Party's anti-crossover rule that had been approved by the Attorney General of the United States, without first receiving "preclearance," thereby violating § 5 of the Act. A three-judge district court was appointed as required by the Act. On August 1, 1986, before the subcommittee decided the contest, that court held that Mr. Graddick had committed flagrant violations of the Voting Rights Act and of state law from which he directly benefited.

The Republican and Democratic primaries are held simultaneously in Alabama. When a voter presents himself or herself to vote at a polling place the voter's name is checked from a list of all registered voters compiled without indication of party affiliation. The voter declares whether he or she will vote in the Republican or Democratic primary. If the voter declares Republican, he or she signs in on a blue poll list or sign-in sheet and is then presented with a Republican ballot (the ballot may be either on a machine, a computer sheet or a paper ballot). If the voter declares Democratic, he or she signs in on a white poll list and is then presented with a Democratic ballot. Ala.Code § 17–16–14(b) provides:

> All poll lists for primary elections shall state at the top thereof that by participating in said primary election a voter shall indicate his preference for the party holding said primary, and will support the nominees of that party in the general

election, and that he is qualified under the rules of such party to vote in its primary election. No person shall be eligible to participate in said primary unless he signs said poll list and thereby certifies to the truth of said statement. (Acts 175, No. 1196, § 13).

The evidence before the subcommittee conclusively showed that a substantial number of crossover votes had been illegally cast in the June 24 Democratic runoff primary. A more firm figure would have been obtainable by comparing all blue sheets (Republican) from the June 3 balloting and the white sheets (Democratic) from the June 24 runoff. (Obviously there were no blue sheets from the June 24 balloting because there was no statewide Republican runoff.) An exact figure would not have been possible because not all signatures were legible. Of the signatures available 1,908 were illegible, and positive comparisons of these signatures could not be made. The committee also found that the blue sign-in sheets for 7,762 persons who voted in the June 3 Republican primary, then in the custody of Republican county officials, were not produced in response to issued subpoenas. Nevertheless, the subcommittee positively identified 10,406 legible signatures of persons who did cross over and 16,372 June 3 Republican voters who did not cross over.[3] Projecting these known proportions to the 9,670 persons who voted Republican on June 3 but whose crossover status was unknown because of illegible signatures or blue sheets not available for signature comparisons, the subcommittee found a bottom line figure of 14,168 illegal crossover votes cast in the Democratic primary runoff on June 24.

The contest subcommittee then heard extensive evidence with respect to how the crossover voters cast their votes in the June 24 Democratic runoff. The evidence was in the form of expert opinion from political scientists and public opinion surveyors. It was largely based on polls and surveys conducted in Alabama during the interim between the June 3 primary and the June 24 runoff.

The Alabama statute provides a procedure by which individual voters can be subpoenaed in the case of a contest and required to testify as to how they voted. Ala.Code § 17-16-75. Where the alleged irregularity involves a comparatively small number of votes, this method enables a contest subcommittee to ascertain precisely how many illegal votes were cast to arrive at an exact result. Counsel for Mr. Graddick concede, however, that utilization of this procedure was impossible in this instance, because the number of votes to be examined were those of the more than 14,-000 crossover voters in the June 24 Democratic runoff.

On the basis of the evidence as to the number of illegal votes cast and opinion evidence with respect to how these votes were cast, the contest subcommittee concluded that Mr. Baxley received a majority of the legal votes cast. The subcommittee then certified Mr. Baxley as the nominee of the party.[4]

### F. *Prior Legal Proceedings.*

Litigation began even before the June 24 runoff when Mr. Graddick obtained the court order from the state court in Mobile designed to facilitate crossover voting.

On election night Mr. Graddick, this time represented by an attorney who also serves as general counsel of the Republican Party, applied to and obtained from a Jefferson County state circuit judge an ex parte or-

---

3. Approximately 36,448 persons voted in the June 3 Republican primary.

4. Three motions for disqualification of Mr. Graddick as a candidate had been filed by five Democratic voters and were considered by the same subcommittee. The subcommittee's order, dated August 15, 1986, indicated that it considered itself bound by the injunction entered by the three-judge district court in *Henderson* either to determine that Mr. Baxley received a majority of legal votes cast or to call a new runoff. The order stated, "Other possible options or alternatives under Alabama law are not available." Although it heard evidence on the disqualification issue, the subcommittee reserved its ruling on that issue.

der directing that certain ballot boxes be impounded.

After the contests of the Democratic runoff primary were filed, Mr. Graddick went back three times to the same Jefferson County circuit judge, and on all three occasions he obtained favorable orders. The first two orders, obtained ex parte, had the effect of impeding the Democratic Party's processing of the contest and its use of subpoenas to obtain from Republican county chairpersons the records that were essential to establish the exact number of crossover votes. These two circuit court orders were promptly reversed by the Alabama Supreme Court. After the second reversal the Supreme Court issued an extraordinary order stating "That the Circuit Court of Jefferson County is hereby restrained and enjoined under penalty of law from entering any other orders or judgments involving the pending democratic gubernatorial primary election contest other than as directed in Paragraph 2 of this order." Paragraph 2 directed the circuit judge to issue a judgment on the merits of Mr. Graddick's petition pending before him within two days. The circuit judge entered an order, without findings of fact or conclusions of law, declaring that Mr. Graddick had won the runoff. This order was promptly vacated by the Supreme Court.

In the meantime, on July 11, two black county officials, as representatives of a class composed of all black registered voters who had voted in the June 3 and June 24 Democratic primaries, had filed *Henderson* in the Middle District of Alabama, challenging, under § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, the legality of the crossover voting practice Mr. Graddick personally and through his office as Attorney General fostered and encouraged. After a hearing, the three-judge district court ruled that the Democratic Party's rule prohibiting crossover voting was valid and binding, that many thousands of crossover voters had voted illegally, that Mr. Graddick's actions utilizing his authority as Attorney General of the state had flagrantly violated the Voting Rights Act and that he had violated state law as well. The court enjoined the State Democratic Execu-

tive Committee from certifying Mr. Graddick as its nominee for governor and ordered it either to call a new runoff primary or to certify Mr. Baxley as the nominee.

Hearings before the contest subcommittee followed quickly. On August 15 it made its decision and certified Mr. Baxley. Mr. Graddick did not appeal to the full State Democratic Executive Committee. Mr. Graddick turned instead to the Alabama Supreme Court, filing on August 27, 1986 a "Petition for Writ of Mandamus, Writ of Prohibition and Other Extraordinary Relief." The court dismissed the petition because Mr. Graddick, having failed to appeal to the State Democratic Executive Committee, had not exhausted his administrative remedies. *Ex parte Graddick, supra.*

Mr. Graddick and Messrs. Curry and Farnell then filed two new suits in a new forum, the United States District Court for the Northern District of Alabama, claiming violations of the due process and equal protection clauses of the Constitution. The cases were consolidated and assigned to a district judge.

The district court held that the merits of the case were properly before it and that the suit was not barred by the previous adjudications in state and federal courts. On the basis of a stipulated record it found that the Democratic contest subcommittee "violated the due process clause of the fourteenth amendment by undermining the fundamental fairness of the electoral process." Its judgment, entered September 18, enjoined the Democratic Party to decertify Mr. Baxley and call a new primary runoff. The injunction also had the effect of enjoining the Party from disqualifying Mr. Graddick, an issue that had been reserved by the contest subcommittee and was not before the district court. This appeal followed.

II.

PRELIMINARY ISSUES

A. *Res Judicata.*

■ The appellants contend that under principles of res judicata the § 1983 claims

asserted by Mr. Graddick and Messrs. Curry and Farnell had been determined in the prior litigation and in the proceedings before the subcommittee and could not be reasserted in the two later-filed cases that are before this court. Application of res judicata is central to the fundamental purpose of the judiciary—the conclusive resolution of disputes. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). Finality "relieve[s] parties of the cost and vexation of multiple lawsuits, conserve[s] judicial resources, and, by preventing inconsistent decisions, encourage[s] reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). These policies apply with equal force when the second lawsuit is brought in a federal forum. By federal statute, state judicial proceedings must be given the same full faith and credit in the federal courts as they enjoy in the courts of the state in which the proceedings occur. 28 U.S.C. § 1738. Thus, a final judgment from the Alabama Supreme Court has the same preclusive effect upon the federal courts as it does upon Alabama courts. *See Migra v. Warren City School District Board of Education*, 465 U.S. 75, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) (state law determines claim preclusion in § 1983 action); *Allen, supra* (state law determines issue preclusion in § 1983 action).

In *Ex parte Graddick* the Alabama Supreme Court issued the following order: "The time for appeal of the subcommittee's decision in the contests having expired and no appeal having been taken, the decision of the subcommittee must stand, and no court is authorized to extend judicial relief." This order prevents any Alabama court from overturning the decision of the subcommittee. Mr. Graddick has now asked the federal courts to grant him this relief.

▮ The "full faith and credit" statute, 28 U.S.C. § 1738, and the principles of comity between state and federal courts impel us toward giving effect to the order of the Alabama Supreme Court that "the decision of the subcommittee must stand, and no court is authorized to extend judicial relief."[5]

However, under Alabama law, four elements must be present for there to be claim preclusion: (1) a prior judgment rendered by a court of competent jurisdiction; (2) substantial identical parties in both suits; (3) a prior judgment rendered on the merits; and (4) the same cause of action in both suits. *Missildine v. Avondale Mills*, 415 So.2d 1040, 1042 (Ala.1981). There is a question whether the third prong of this test has been satisfied in this case. Alabama courts regard a decision as "on the

---

5. · Also, arguably the cases now before us are nothing more than attempts to appeal from and set aside the judgment of the Alabama Supreme Court. It is long settled doctrine that only the Supreme Court of the United States may hear appeals from the highest court in a state. 28 U.S.C. § 1257; *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1943). It follows ineluctably that a federal court has no jurisdiction over issues that are "inextricably intertwined" with allegations underlying the judgment of a state supreme court. This maxim holds true even when the challenger asserts a constitutional claim. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 486–87, 103 S.Ct. 1303, 1316–17, 75 L.Ed.2d 206 (1983). In *Reynolds v. Georgia*, 640 F.2d 702, 707 (5th Cir. Unit B), *reh'g denied*, 645 F.2d 72, *cert. denied*, 454 U.S. 865, 102 S.Ct. 326, 70 L.Ed.2d 165 (1981), we observed:

Despite plaintiff's portrayal of her dissatisfaction with the Georgia [Supreme] Court's decisions as a distinct injury, it is manifest from the prayers of her complaint that she seeks essentially an appellate review of those decisions. "It is the essential criterion of appellate jurisdiction, that it revises and corrects the proceedings in a cause...." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175, 2 L.Ed. 60 (1803). "[T]o reverse or modify [a] judgment [of the state supreme court] ... would be an exercise of appellate jurisdiction." *Rooker*, 263 U.S. at 416, 44 S.Ct. at 150. The addition of several new defendants in this action does not alter the prohibited character of relief she seeks, *see id.* at 414, 44 S.Ct. at 149, nor is it significant that she presents her claim under section 1983 as well as under the Constitution. [Citations omitted]. Plaintiff still seeks a type of review which is beyond the power of this Court.

The district court noted that it "does not have the authority to sit as an appellate court." Arguably that is precisely what it did.

merits" unless the outcome is controlled by technical defects in the pleadings. *Compare, DeCrosta v. A. Reynolds Construction and Supply Corp.*, 41 N.Y.2d 1100, 396 N.Y.S.2d 357, 364 N.E.2d 1129 (1977) (judgment based on statute of limitations defense is "on the merits"). Alabama courts will generally give a decision preclusive effect "if ... the parties had a full legal opportunity to be heard on their respective claims and contentions." *ABC Truck Lines*, 247 Ala. 543, 25 So.2d 511, 513 (Ala.1946).

As noted above, the Alabama Supreme Court dismissed Mr. Graddick's case for failure to exhaust his administrative remedies by appealing the subcommittee's decision to the full Committee. Whether in this circumstance Alabama courts would consider plaintiffs as having "had a full legal opportunity to be heard" and their claims therefore precluded, is an issue both complicated and not free from doubt. For this reason, and for these additional reasons, we decline to reach a decision on res judicata grounds: 1) the constraints of time in our decision-making process, (2) the comparative ease involved in reaching a decision on the merits, and (3) the overriding public interest in a dispositive result.

### B. *Effectiveness of the Rule.*

We understand that plaintiffs do not challenge in this court the validity of the Democratic Party's rule against crossover voting. Indeed, they could hardly do so; the validity of the rule was squarely adjudicated by the three-judge court in *Henderson*. While, as discussed just above, we decline to decide this case on the basis that the *claims* Mr. Graddick now asserts have been determined in prior litigation ("res judicata"), it is clear that *issues* raised and decided in prior litigation to which Mr. Graddick was a party ("issue preclusion") are binding on him and were binding on the district court. Despite this principle, the district court's Memorandum Opinion of September 17 treats the validity of the rule as a matter of considerable doubt. This is simply wrong.

Plaintiffs contend that the subcommittee could not decide the contest based on data secured through surveys and by polling voters. At the same time they conceded that because of the massive number of illegal crossover voters it was impossible to call all these voters in to testify and conduct a one-by-one examination of how each voted on June 24. Thus, plaintiffs contended that the only remedy was to order a new runoff between Mr. Baxley and Mr. Graddick. These contentions must be measured in the light of the purposes of the rule and its effectiveness and the interests vindicated by it.

The crossover rule is a proper response to the Alabama State Democratic Executive Committee's responsibility under Alabama law. It is clear and unambiguous. It is manifestly reasonable. It has the force and effect of state law. Ala.Code § 17–16–14. Since its clearance under the Voting Rights Act any inconsistent practice has been prohibited as a matter of federal law.

There has been no room for uncertainty about what the rule means or its validity. The district court speculated that the Democratic Party may have been bound by an alleged past practice of allowing crossover votes. The three-judge court in *Henderson* found that there had not been such a practice, and the district court in this case was bound to respect that finding. Beyond that, the record does not support the existence of a past practice of allowing crossover votes. The three-judge opinion in *Henderson* dealt effectively with the "failure to enforce" contention. This is the first occasion in which a violation of this particular rule has been the basis of a contest filed before the Democratic Executive Committee. There is no indication in the record that in any other contests the State Committee has failed to resolve such contests in accordance with its responsibilities. There is no indication in the record that at any time since the adoption of the "no crossover" rule there has been a massive crossover of illegal voters such as voted in the June 24 Democratic primary

runoff or that the outcome of any other primary election between 1979 and 1986 would have been affected by crossover votes.

■ The district court also questioned whether the electorate was "properly" notified of the rule against crossover voting. Assuming that publicity is necessary, the opinion in *Henderson* sets out the significant steps taken by the Democratic Party to publicize the crossover rule throughout the state. To be sure, there was some confusion before and during the Democratic primary runoff. Undoubtedly innocent persons were misled and voted illegally but, as the *Henderson* decision points out, the principal actors who caused the confusion, and did so in violation of law, were Mr. Graddick and those aligned with him. They are in no position to seek substantive advantage from this confusion.

### C. *Magnitude and Effect of the Violation.*

By conduct that was adjudged in *Henderson* to constitute flagrant violations of the Voting Rights Act and of state law, Mr. Graddick and those working with him orchestrated the casting of thousands of illegal votes. The precise number cannot be ascertained. The record demonstrates with certainty that 10,406 illegal ballots were identified. The record shows with reasonable reliability that 14,168 illegal votes were cast. Mr. Graddick is in a poor position to complain about the extrapolation of this final figure. His efforts, as reflected in the *Henderson* proceedings, to thwart the subpoenaing of June 3 election records, which were then in the hands of Republican officials, occurred at the precise time that steps were required to ensure that the records were preserved and produced.

■ Irrefutable evidence establishes massive violations of state and federal law. To the extent that the district court inti-

mated to the contrary it was in error. It was not free to reexamine facts established by the three-judge court in *Henderson* and, when it did reexamine, its conclusion (or intimation) based thereon was manifestly incorrect.

### D. *The Disqualification Issue.*

■ The contest subcommittee reserved the issue of whether it might disqualify Mr. Graddick as a candidate, apparently in compliance with its understanding of the *Henderson* court's injunction. The subsequent order of the *Henderson* court eliminated any such constraint. Mr. Graddick concedes that the state party has the power to disqualify him. Protection from the party's power of disqualification is not even sought by either of plaintiffs' complaints. Yet, the district court's injunction inexplicably framed its proscriptive language to forbid Mr. Graddick's disqualification. This overreaching remedy would require reversal if the judgment of the district court were otherwise free of error.

### E. *The Standing of Appellees Curry and Farnell.*

Plaintiffs Curry and Farnell voted for Mr. Graddick in the June 24 Democratic primary runoff. Both allege that they did not vote in the Republican Party primary on June 3. Thus they are not crossover voters.

■ These plaintiffs contend that the result of the election contest infringed their constitutional right to have their individual votes counted (although in fact their votes were counted, since they were not crossovers) to have a winner declared based on a count of votes actually cast by a majority of qualified voters, and they also allege that the effect of their votes was diluted. This court has serious doubt whether they had standing in the district court and whether they have standing in this appeal.[6]

---

6. They assert that the use of polling data by the subcommittee undermines the fundamental fairness of the electoral process. If the method used by the subcommittee was constitutionally flawed, the injury suffered was common to all

voters, and indeed all citizens alike—an injury to an interest shared by all citizens, to have a reliable determination of the winner in an election. In *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court

Despite these serious doubts this court recognizes that a non-frivolous argument can be made that 42 U.S.C. § 1983 provides the required statutory basis for standing. Because Mr. Graddick clearly has standing and other more reliable grounds for our decision are sufficiently broad to dispose of Curry's and Farnell's claims, we decline to rule on the issue of their standing.

### III.

### PLAINTIFFS' PRINCIPAL CLAIM FOR RELIEF

Plaintiffs contend that the contest subcommittee's consideration of data secured through surveys and polls entitled them to federal relief under § 1983. While recognizing that it was not possible to subpoena thousands of voters one by one and establish by testimony how each voted in the June 24 Democratic runoff, plaintiffs insist that the only alternative to this futile approach is to order a new runoff between Mr. Graddick and Mr. Baxley. They suggest no alternative and attack the alternative the subcommittee pursued. The district court accepted plaintiffs' argument.

Plaintiffs admit, however, that the three-judge federal court and the subcommittee found that the runoff was marked by widespread misrepresentations and illegal actions by the Attorney General and his staff at the highest level. Plaintiffs also do not contest that the State Democratic Executive Committee was the responsible body under Alabama state law to determine the result of a contested primary. It had the duty, if such could be done, of ascertaining the candidate who had received a majority of the legal votes cast.

The district court erred in holding, as contended by Mr. Graddick, that the subcommittee's action could be supported only by a precise determination as to the *specific number* of votes *illegally* cast. The district court erroneously held that unless the number of illegal votes was established to a "mathematical certainty," there was "no evidentiary basis" for the subcommittee's decision. This misperceives the duty of the subcommittee, the burden of proof established by state law, and the right of the subcommittee to determine the evidence it would consider.

Plaintiffs conceded in oral argument that the subcommittee did not intentionally or willfully deprive them of their rights; rather they contend that it used an unacceptable method and unacceptable data. The subcommittee had the duty, if such could be done, of ascertaining the candidate who had received a majority of the legal votes cast. Under the circumstances of this case we cannot conclude that the subcommittee could use only mathematically precise voter-by-voter testimony to determine which candidate received the most *legal* votes cast.

Under Alabama law, the contestants' burden of proof was to *reasonably satisfy* the committee. Possibly there might be a case in which the quantum of proof adduced was so insufficient that a constitu-

---

noted the distinction between "'a plain, direct and adequate interest in maintaining the effectiveness of their votes,' not merely a claim of 'the right possessed by every citizen to require that the Government be administered according to the law ...'" *Id.* at 208, 82 S.Ct. at 705 (citations omitted).

Inserting the term "vote dilution" in an election contest case is not a talisman. In *Hubbard v. Ammerman*, 465 F.2d 1169, 1182 (5th Cir. 1972), *cert. denied*, 410 U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973), the predecessor of this court held:

> In the absence of a statute to the contrary, none but a candidate claiming to have been injured by illegalities therein occurring can contest the certified results of an election.

No private person can bring such a contest on the pretext of "redressing a public wrong."

The district court relied upon *Gray v. Sanders*, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), to find that Curry and Farnell had standing. *Gray* was a reapportionment case. Voters alleging dilution caused by malapportionment of voting districts have standing to challenge the apportionment.

The prudence of granting standing to voters in the present situation is highly questionable. The ultimate thrust of the individual plaintiffs' contention is that any voter can invoke federal jurisdiction to review the resolution of any vote tabulation or election contest with which he is dissatisfied. This would effectively federalize contests of state and local elections.

tional issue would be raised. This is not such a case. The evidence before the subcommittee was clearly sufficient to meet the statutory standard set by Alabama law. The subcommittee's findings based thereon were reasonable under the circumstances and were not arbitrary and capricious.

The findings of the subcommittee were accorded no deference by the district court. Instead the district court embraced Mr. Graddick's erroneous contention that he was entitled to the nomination or at least to a new election unless the mathematically exact number of illegal votes could be itemized and proved. Under this standard, massive voting irregularities could never be effectively redressed; it would put a premium on wrongdoing of enormous proportions.

For these reasons, and those discussed immediately below, the subcommittee's actions complained of do not implicate any federally protected right. And, even if plaintiffs had demonstrated a federally protected right, the subcommittee's actions were permissible means of protecting a substantial state interest.

### A. *Failure to Establish a Constitutional Deprivation.*

"The first inquiry in any section 1983 suit, ... is whether the plaintiff has been deprived of a right *'secured by the Constitution and laws.'*" *Baker v. McCollan,* 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979) (emphasis added). In this case Mr. Graddick and his supporters point to a fundamental right to vote grounded in the due process clause of the Constitution. They allege that this substantive due process right is diluted and debased by the subcommittee's reliance on polling data. Plaintiffs cite a number of cases where the dilution of votes has served as the basis for a constitutional violation. *See Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (systematic discrimination against voters of a certain class); *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), *reh'g denied,* 379 U.S. 870, 85 S.Ct.

12, 13 L.Ed.2d 76 (1964) (malapportioned voting districts); *Gray v. Sanders,* 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963) (weighted voting systems); *U.S. v. Saylor,* 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944), *reh'g denied,* 323 U.S. 809, 65 S.Ct. 27, 89 L.Ed. 645 (1944) (stuffing of ballot boxes).

 The right to vote embodied in the substantive due process clause is considerably narrower than plaintiffs depict. "The functional structure embodied in the Constitution, the nature of the federal court system and the limitations inherent in the concepts both of limited federal jurisdiction and of the remedy afforded by § 1983" operate to restrict federal relief in the state election context. *Gamza v. Aguirre,* 619 F.2d 449, 452 (5th Cir.), *reh'g denied,* 625 F.2d 1016 (1980); *see also Duncan v. Poythress,* 657 F.2d 691 (5th Cir. Unit B), *reh'g denied,* 664 F.2d 291 (11th Cir.1981), *cert. denied,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 *cert. dismissed,* 459 U.S. 1012, 103 S.Ct. 368, 74 L.Ed.2d 504 (1982). Although federal courts closely scrutinize state laws whose very design infringes on the rights of voters, federal courts will not intervene to examine the validity of individual ballots or supervise the administrative details of a local election. *Griffin v. Burns,* 570 F.2d 1065, 1078 (1st Cir.1978). Only in extraordinary circumstances will a challenge to a state election rise to the level of a constitutional deprivation. In *Gamza, reh'g denied,* 625 F.2d 1016 (1980) our predecessor court

> recognize[d] a distinction between state laws and patterns of state action that systematically deny equality in voting, and episodic events that, despite non-discriminatory laws, may result in the dilution of an individual's vote. Unlike systematically discriminatory laws, isolated events that adversely affect individuals are not presumed to be a [constitutional violation].

619 F.2d at 453.

 Plaintiffs contend that the subcommittee's arbitrary use of the challenged

evidence was not such an "episodic event." In evaluating claims arising from "episodic events," courts have followed the general rule that "if the election process itself reaches the point of patent and fundamental unfairness, a violation of the due process clause may be indicated and relief under § 1983 therefore in order. Such a situation must go well beyond the ordinary dispute over the counting and marking of ballots." *Duncan v. Poythress,* 657 F.2d at 703, (quoting *Griffin v. Burns,* 570 F.2d 1065, 1077 (1st Cir.1978)). *See also, Welch v. McKenzie,* 765 F.2d 1311, 1317, *vacated on other grounds and remanded,* 777 F.2d 191 (5th Cir.1985); *Hennings v. Grafton,* 523 F.2d 861 (7th Cir.1975). As with much of the law of substantive due process, there are no bright lines distinguishing "patent and fundamental unfairness" from " 'garden variety' election disputes." *See Welch v. McKenzie,* 765 F.2d at 1317. The case law, however, demonstrates that plaintiffs' complaints fall far short of a constitutional deprivation.

*Gamza, supra,* posed this issue in clear terms. Gamza and four of his supporters alleged that election officials had negligently and unlawfully performed the vote count, thereby costing him the election. The Fifth Circuit found that plaintiff failed to state a constitutional deprivation under § 1983.

> In the absence of evidence that the alleged maladministration of the local election procedures was attended by the intention to discriminate against the affected voters or motivated by a desire to subvert the right of the voters to choose their ... representative, we cannot conclude that the error constituted a denial of equal protection of the laws.

619 F.2d at 454.

Plaintiffs in *Johnson v. Hood,* 430 F.2d 610 (5th Cir.1970) also presented a claim closely analogous to the one before this court. There, plaintiffs alleged that the county election commission's decision to re-

ject ten ballots as improper was arbitrary, capricious and without any reasonable basis. In a per curiam opinion ordering dismissal the Fifth Circuit rejected this argument and ruled that these facts, even if true, failed to support a valid constitutional violation.

Plaintiffs in *Welch v. McKenzie, supra,* alleged that an election was stolen by irregularity and fraud and that the Democratic executive committee acted contrary to the law in failing to overturn the election result. Relying on case law binding on this circuit, the Fifth Circuit concluded that this was a "garden variety" election dispute which did not rise to the level of a constitutional deprivation. The *Welch* court reasoned that *Gamza* set out the typical situation: "even though votes inadvertently counted incorrectly threw an election to the wrong candidate, this court refused to intervene." *Welch,* 765 F.2d at 1317. Citing *Gamza* as controlling, the Fifth Circuit held that the claim before it was not actionable in federal court because our federal system contemplates that states will be primarily responsible for regulating their own elections.[7]

Other circuits have consistently reached the same conclusion. *Pettengill v. Putnam County School District, Unionsville, Missouri,* 472 F.2d 121 (8th Cir.1973) is another instance in which a federal court refused to interject itself into an election controversy. *Pettengill* raised the same constitutional complaint as plaintiffs here, claiming that the right to vote had been diluted by defendant's improper counting of ballots. The Eighth Circuit concluded that a federal court should not be "the arbiter of disputes" which arise in elections; it was not the federal court's role to "oversee the administrative details of a local election." The court found no constitutional grounds for intervention

> in the absence of aggravating factors such as denying the right of citizens to vote for reasons of race, or fraudulent

---

7. Even in cases involving overt racial discrimination this court has considered the voiding of a state election to be "drastic, if not staggering ...

and therefore a form of relief to be guardedly exercised." *Bell v. Southwell,* 376 F.2d 659, 662 (5th Cir.1967).

interference with a free election by stuffing of the ballot box, or any other unlawful conduct which interferes with the individual's right to vote.

*Pettengill,* 472 F.2d at 122 (citations omitted). *See also, Hennings v. Grafton,* 523 F.2d 861 (7th Cir.1975); *Powell v. Power,* 436 F.2d 84 (2d Cir.1970).

The instances in which courts have concluded that "the very integrity of the electoral process" has been brought into doubt bear little similarity to the facts before this court. In *Duncan v. Poythress,* 657 F.2d 691 (5th Cir. Unit B 1981) the claim did not even involve a disputed election; rather it was the failure to call an election that was the basis for the action. The *Duncan* court found a violation of constitutional rights when the governor and a state supreme court justice of Georgia intentionally and willfully conspired to prevent a special election that was required by law. The court noted that the case involved not the dilution of votes but the violation of the entire electorate's right to participate in an election. The court also emphasized that defendants' intent was to prevent the exercise of the plaintiff's right to vote. These are very different circumstances from this case in which any deviation from absolute accuracy occurred as an incidental result of the Democratic Committee's attempt to determine the lawful primary winner in circumstances where plaintiffs had created the situation making absolute accuracy impossible.

*Griffin v. Burns,* 570 F.2d 1065 (1st Cir. 1978) arose out of a Rhode Island local primary in which the secretary of state had authorized, advertised, and issued absentee ballots that the Rhode Island Supreme Court later ruled improper. Plaintiffs had relied on the government's assurances that absentee ballots would be counted and chose to vote absentee rather than in person. The court recognized that the Constitution confers the "power to control the disposition of contests over elections to ... state and local offices." *Id.,* at 1077 (quoting *Hubbard v. Ammerman,* 465 F.2d 1169, 1176 (5th Cir.1972), *cert. denied,* 410

U.S. 910, 93 S.Ct. 967, 35 L.Ed.2d 272 (1973)). The First Circuit believed, however, that these unique facts amounted to "a broad-gauged unfairness" which called the state's integrity, and those of the election results, into question. Almost 10% of the qualified voters in the election were denied their vote in a close election because of the state's own error. Significantly, there was also no standard state procedure for handling a claim such as Griffin's.

In this case the district judge became engulfed in the morass of election details. The bulk of the district court's opinion is consumed by the technical data of election returns and polls and the nuances of Alabama voting trends. The high standards for making out a constitutional violation were propounded to prevent federal judges from speculating—as did the district judge here—about the voting proclivities of the "Yuppie" population of north Shelby County and the number of voters who signed a petition for a Montgomery County independent candidate. This kind of factfinding is for party officials and state courts, not federal judges. Errors in this sort of factfinding by a contest committee or a state court, if any occur, would be unfortunate but would not constitute "patent and fundamental unfairness."

Plaintiffs have attempted to recharacterize their claims in constitutional terms. The district court accepted this characterization as the cornerstone of its opinion. Plaintiffs' claims are, in truth, "the ordinary dispute over the counting and marking of ballots," *Duncan,* 657 F.2d at 703. In fact they are an even narrower dispute about evidence admissible in a contest over ballots. Settling a dispute brought about by illegal ballots was the task in which the State Democratic Executive Committee engaged. Plaintiffs alleged that the party's subcommittee used the wrong data and reached the wrong conclusion. That does not change the nature of the dispute. Such a dispute does not rise to the level of a constitutional deprivation.

■■■ There is no evidence that plaintiffs lacked an adequate remedy in the

state courts. *See Griffin v. Burns,* 570 F.2d 1065 (1st Cir.1978). Alabama law provides an adequate procedure for addressing election irregularities. Ala.Code 17–15–1 *et seq.* Along with an opportunity to present evidence before the subcommittee, Mr. Graddick was entitled to appeal to the full State Democratic Committee. *See Ex parte Graddick,* 495 So.2d 1367 (Ala. 1986). If the full State Democratic Committee had denied his appeal, Mr. Graddick had recourse to the state courts. Alabama state courts have recognized a duty to hear cases where the State Democratic Executive Committee has failed to follow the mandates of Alabama law. *Perloff v. Edington,* 293 Ala. 277, 302 So.2d 92 (1974) (writ of prohibition); *Hobbie v. Vance,* 292 Ala. 367, 294 So.2d 743 (1974) (declaratory judgment and mandamus). Plaintiffs elected not to appeal to the State Democratic Committee in accordance with state law. A federally protected right "is implicated where the entire election process—including as part thereof the state's administrative and judicial corrective process—fails on its face to afford fundamental fairness." *Griffin,* 570 F.2d at 1078. That is not the case here. State process was available but it was not used.[8]

## B. *Compelling State Interests Served By Reliance on Polling Data.*

Even if plaintiffs' claimed deprivation had risen to a constitutional level, this court would be compelled to uphold the contest subcommittee's actions. The court below erred in failing to give sufficient weight to the substantial state interests served in this case by the use of polling data. In this case of massive voting illegality the use of such evidence made possible the protection of the state's interests in insuring honest and fair elections and preserving the rights of its voters and political parties.

Expert testimony such as that received by the contest subcommittee can play a critical role in safeguarding the fairness of the election process. Without the use of this evidence election authorities would be powerless to deal with massive voting irregularities. Faced with wrongdoing on a grand scale, a ballot-by-ballot challenge to over 10,000, and possibly over 14,000, illegal votes was admittedly impossible.

Use of such evidence may also be necessary to protect the rights of voters and candidates. Requiring a new election in all cases of massive voting irregularities would impinge on the rights of those candidates who received the most lawfully cast votes. In addition, a new election would violate the rights of those who voted for the rightful victor. The due process clause protects the right of these voters to have their votes counted. *U.S. v. Mosley,* 238 U.S. 383, 386–87, 35 S.Ct. 904, 905, 59 L.Ed. 1355 (1915); *Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963). A state cannot be relegated to rules that inevitably would lead to the violation of the rights of innocent voters.

Acting pursuant to state law, the Democratic Party's contest subcommittee relied on polling and survey data to protect its state interests. No other method has been suggested by which the subcommittee could overcome the effect of the massive illegal voting that infected its primary run-off and determine the candidate with the most legally cast votes.

Courts have found statistical data to be relevant to a variety of determinations. *See e.g., Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.,* 716 F.2d 833 (11th Cir. 1983) (survey allowed to show that similar trademark confused consumers); *Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) (statistics allowed to make out prima facie case of employment discrimination). The courts permit, and often require, statistical data

---

8. Plaintiffs' arguments tend to stray into the arena of procedural due process. To the extent that a procedural due process claim is asserted, the existence of adequate state law remedies precludes plaintiffs from recovery under § 1983. *See Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); *Gilmere v. City of Atlanta, Ga.,* 774 F.2d 1495 (11th Cir. 1985) (en banc), *cert. denied,* — U.S. —, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986).

and surveys to prove discrimination in exclusion of persons from jury service on gender or race grounds, in age discrimination, malapportionment, and in a wide range of other circumstances.

The United States Supreme Court has rejected the district court's conclusion that a ballot-by-ballot striking of voters is the only approach permitted by the due process clause. Indeed, the Supreme Court specifically rejected the notion that ballot-by-ballot striking of votes was even a viable approach to the crossover problem, the very problem before the Alabama Democratic Party. In *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973), a New York statute that restricted voting in the Democratic primary to registered Democrats was challenged as a violation of plaintiff's right to vote. The plaintiff in *Rosario,* like the plaintiffs here, argued that a ballot-by-ballot striking of crossover voters was required since New York's method infringed on his right to vote. The Supreme Court upheld the New York law, holding that the law served an important role in the "preservation of the integrity of the electoral process." *Id.* at 761, 93 S.Ct. at 1251. The Supreme Court considered a ballot-by-ballot approach too weak a means of remedying the crossover problem. It said this:

> The petitioners contend that New York already has less drastic means to prevent raiding [crossovers]—means that would accomplish the State's goal yet would permit the registrant who inadvertently failed to enroll in time to vote in the primary. Specifically, the petitioners point to § 332 of the State's Election Law, which provides that the party enrollment of any voter may be challenged by any party member and, upon the determination of the chairman of the party's county committee that the voter is not in sympathy with the principles of the party, may be canceled by a justice of the State Supreme Court after a hearing. *That section, however, is clearly too cumbersome to have any real deterrent effect on raiding in a primary.* Every challenge to a would-be raider requires a full administrative and judicial inquiry; proof that the challenged voter is not in sympathy with the party's principles demands inquiry into the voter's mind; and *even if the challenge is successful, it strikes from the enrollment books only one name at a time. In the face of large-scale raiding, § 332 alone would be virtually ineffectual.* We agree with the Court of Appeals that "[i]n requiring that the State use to a proper end the means designed to impinge minimally upon fundamental rights, the Constitution does not require that the state choose ineffectual means."

*Id.* at 762 n. 10, 93 S.Ct. at 1252 n. 10 (emphasis added).

The State Democratic Executive Committee simply followed the teachings of *Rosario.* It was the clear finding of the three-judge panel in *Henderson* that large-scale crossover voting had occurred. That federal court referred the matter to the party's contest subcommittee as the proper body under state law. The United States Supreme Court has found that the "distortions" posed by crossover voting threaten the "integrity and reliability of the electoral process itself," *Anderson v. Celebrezze,* 460 U.S. 780, 788 n. 9, 103 S.Ct. 1564, 1570 n. 9, 75 L.Ed.2d 547 (1983), and that political parties may be forced to resort to strong measures to protect themselves against these "intrusion[s] by those with adverse political principles." *See also, Ray v. Blair,* 343 U.S. 214, 221–22, 72 S.Ct. 654, 658, 96 L.Ed. 894 (1952); *Rosario v. Rockefeller, supra; Democratic Party of U.S. v. Wisconsin,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981).

Faced with massive crossovers, the contest subcommittee heeded the Supreme Court's advice in *Rosario* and adopted the only practical approach available to it—it utilized expert statistical and survey testimony as the most reliable evidence available to protect the fairness of the election process and the rights of Alabama's citizens and political parties. It cannot be held that its action shocks the conscience of a court. To the contrary, it was clearly

reasonable under the circumstances before the subcommittee.

## IV.

The district court erred in granting relief to the plaintiffs.[9] The judgment of the district court is reversed and its injunction is vacated. The case is remanded to the Northern District of Alabama with instructions to the Chief Judge of that court that he dismiss it immediately without further proceedings. Each party shall bear his own costs. The mandate shall issue forthwith.

REVERSED, INJUNCTION VACATED and REMANDED with instructions.

---

**9.** The court's requirement with respect to Mr. Graddick's write-in campaign was also erroneous. The effect of our ruling is to nullify that requirement and the written waiver and consent filed by Mr. Graddick to comply therewith.