Matthew SHANNON, Josephine Alexander, Henry A. Fiebiger, Sandra R. Fiebiger, A. Paul Herubin, and Patrick Gubbins, Plaintiffs–Appellees,

v.

David JACOBOWITZ, Defendant–Appellant,

Oneida County Board of Elections, Angela Pedone Longo, as Commissioner of Oneida County Board of Elections, and Patricia Ann Dispirito, as Commissioner of Oneida County Board of Elections, Defendants.

Docket No. 04–1113–CV.

United States Court of Appeals, Second Circuit.

Argued: June 14, 2004.

Decided: Jan. 7, 2005.

Tom Marcelle, Albany, NY, for Defendant–Appellant.

Carl J. Cochi, Utica, NY, for Plaintiffs–Appellees.

Eliot Spitzer, Attorney General of the State of New York (Caitlin J. Halligan, Solicitor General, Daniel Smirlock, Deputy Solicitor General, Victor Paladino, Assistant Solicitor General, of counsel), Albany, New York, for amicus curiae the Attorney General of the State of New York.

Before: WALKER, Chief Judge, B.D. PARKER and WESLEY, Circuit Judges.

WESLEY, Circuit Judge.

This case presents a constitutional claim arising from a voting machine malfunction in a local New York election. On November 4, 2003, David Jacobowitz stood for election to the office of Town Supervisor in the Town of Whitestown, Oneida County, New York. His opponent was plaintiff Matthew Shannon, the incumbent. The names of both candidates appeared in several places on the ballot, Jacobowitz on lines 11–A and 11–E, and Shannon on lines 11–B, 11–C, and 11–D. When the polls closed and the votes were counted, the Board of Elections unofficially declared Jacobowitz the winner by a margin of 25 votes. The tally was 2,936 to 2,911.

The election inspectors soon noticed a problem with voting machine "A" in Whitestown Election District 14. Although both the machine's public counter and the election inspectors' list reflected that 295 voters used the voting machine, only 156 votes were registered on the machine in the Supervisor's race. Further, the inspection return showed that only one vote was entered on line 11–B (one of the lines on which Shannon's name appeared). Each of the four election inspectors—two Democrats and two Republicans—made a notation on the return of canvass indicating a "possible machine break."

Together with Matthew Shannon, plaintiffs are voters who claim that their votes were not counted due to the machine malfunction. Rather than pursue the state remedy of quo warranto by requesting

that New York's Attorney General investigate the machine malfunction and challenge the election results in state court, N.Y. Exec. Law § 63–b, plaintiffs filed their complaint in federal court, pursuant to 42 U.S.C. § 1983. They sought declaratory and injunctive relief and claimed, among other things, that the Board of Elections violated the Due Process Clause of the Fourteenth Amendment by depriving them of their right to vote and to have their votes counted.

Although the district court acknowledged that plaintiffs had not alleged that the Board of Elections *intentionally* deprived them of their rights, the court nevertheless found that plaintiffs had sufficiently demonstrated a likelihood of success on the merits by showing that quo warranto was neither an adequate nor a fair remedy for the unintentional deprivation of plaintiffs' voting rights. The court agreed with plaintiffs' assertion that quo warranto was "purely discretionary and it [would] occur[ ] well after [the] wrong was done." *Shannon v. Jacobowitz*, 301 F.Supp.2d 249, 256 (N.D.N.Y.2003). The court also found that Shannon and the voters would suffer irreparable harm absent an injunction. *Id.* at 258. Accordingly, the district court issued preliminary injunctions enjoining the Oneida County Board of Elections from taking any action to certify Jacobowitz the winner and enjoining Jacobowitz from assuming the Supervisor's office. *Id.* The parties agreed that Shannon would remain in office pending resolution of the litigation. *Id.* at 256. *See* N.Y. Pub. Off. Law § 5.

Subsequently, plaintiffs moved for summary judgment. Because the facts were mostly uncontested by defendants, the district court saw no need for extended discovery and adopted the facts as presented by plaintiffs in their motion for preliminary injunction. The court found that despite the voting machine malfunction, "Shannon [was] the actual winner of the election." *Id.* at 253. The court reasoned that although typically some non-participation among voters occurs, non-participation was not a likely explanation for the discrepancy between the number of voters who used machine "A" and the number of votes cast on that machine for Town Supervisor. The rate of non-participation for voting machine "A" in District 14 was 47.1%. *Id.* at 252. In contrast, the next highest rate of non-participation recorded in any district in the Supervisor race was 7.1%, and the non-participation rate on the other machine in District 14 was 1.49%. *Id.*

The district court further noted that approximately one month after the election, a voting machine technician examined and tested the machine and determined that "the mechanical wheel which operates the counter on Line 11B malfunctioned in such a way as to not advance each time the lever was pulled by a voter on Line 11B." *Id.* at 253. Given this information, and the affidavits of seventy registered voters who swore they voted for Shannon on line 11–B using voting machine "A," the district court concluded that voting machine "A" had malfunctioned. *Id.* The court further concluded that, as a result of the malfunction, Shannon had at least 69 votes, and perhaps as many as 139 votes, cast for him but not counted. *Id.*

The district court granted summary judgment to plaintiffs on due process grounds and made its preliminary injunctions permanent.[1] *Shannon v. Jacobowitz,*

---

1. Although plaintiffs' complaint also alleged claims under the Equal Protection Clause and Articles I and II of the New York State Constitution, the district court's injunctions and ruling on the summary judgment motion were entered on the basis of § 1983. We therefore limit our review here to that claim.

No. 5:03–cv–1413, 2004 WL 180253 (N.D.N.Y. Jan.27, 2004). The court relied on language in *Gold v. Feinberg*, 101 F.3d 796 (2d Cir.1996) and determined that even if an election mistake resulting in a loss of votes was inadvertent or negligent, it still established a constitutional deprivation if the available state remedy was not fair or adequate. The court concluded that quo warranto was an inadequate remedy because an investigation by the Attorney General was unnecessary when all agreed that the voting machine malfunctioned, that a discretionary action by the Attorney General would not necessarily have permitted an aggrieved candidate and the voters to assert their rights, and that there was no danger that the Town Supervisor position would be vacant since the parties had agreed that Shannon would remain in office during the litigation. *See Shannon*, 301 F.Supp.2d at 256. The Court also found the remedy unfair:

> It is not a fair remedy to know without doubt that votes were cast in favor of a candidate but lack a provision in the law by which those votes can be counted within a reasonable time. It is not a fair remedy to sit idly and watch the opposing candidate be sworn in, knowing full well that the wrong person is taking public office. It is not a fair remedy to forgo your duty, as a duly elected public servant, to fill the position for which you were elected by the citizenry. It is not a fair remedy, as a citizen, to be governed by one whom [sic] it is clear to see was not elected to the office he holds.

**2.** We have no occasion to consider, and therefore express no opinion on, whether the New York Attorney General's refusal to bring a quo warranto action on facts such as these might constitute intentional state action of the sort necessary to create a potential due process violation.

**3.** We review a district court's grant of summary judgment *de novo*, construing the evi-

It is not a fair remedy to require the Board of Elections to certify an election result which it knows is incorrect. It is not a fair remedy to the opposing candidate to be sworn into office under uncertain circumstances and to be exposed to personal liability. It is not a fair remedy where the one avenue to correct such an injustice is available only after the fact, and then is purely discretionary and doubtless protracted.

*Id.* at 257–58.

In our view the district court mistakenly defined the constitutional right by the state remedy while bypassing the determinative threshold question: whether the state actors' conduct was intentional. Because Supreme Court jurisprudence plainly requires intentional conduct by state actors as a prerequisite for a due process violation, and because there was no such conduct here, we reverse.[2]

### Discussion [3]

■ The right to vote is regarded as "a fundamental political right, ... preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). As "the citizen's link to his laws and government," *Evans v. Cornman*, 398 U.S. 419, 422, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970), the right to vote is "at the heart of our democracy." *Burson v. Freeman*, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (Blackmun, J., plurality opinion).

dence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor. *See June v. Town of Westfield*, 370 F.3d 255, 257 (2d Cir.2004). We will affirm the judgment only if there is no genuine issue as to any material fact, and if plaintiff is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c).

"Principles of federalism limit the power of federal courts to intervene in state elections, however." *Burton v. Georgia,* 953 F.2d 1266, 1268 (11th Cir.1992). The Constitution "leaves the conduct of state elections to the states," *Gamza v. Aguirre,* 619 F.2d 449, 453 (5th Cir.1980), and the Supreme Court has "recognized that the States 'have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised.'" *Evans,* 398 U.S. at 422, 90 S.Ct. 1752 (quoting *Lassiter v. Northampton Election Bd.,* 360 U.S. 45, 50, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959)). Because the states traditionally have authority over their own elections and because the Constitution contemplates that authority, courts "have long recognized that not every state election dispute implicates federal constitutional rights." *Burton,* 953 F.2d at 1268. "Only in extraordinary circumstances will a challenge to a state [or local] election rise to the level of a constitutional deprivation." *Curry v. Baker,* 802 F.2d 1302, 1314 (11th Cir.1986).

In this case, appellees argue that because a voting machine malfunctioned in a local election and the resulting miscount was "outcome determinative," the Oneida County Board of Elections and its officers violated their constitutional due process rights in the absence of a viable state remedy. They rely on language in one of our previous cases, *Gold,* to support their underlying claim that, even in the absence of intentional conduct, the lack of an "adequate state remedy" is a sufficient alternative basis to establish a due process violation. We disagree.

The Due Process Clause of the Fourteenth Amendment declares that "no State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. However, in *Daniels v. Williams,* 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986), the Supreme Court concluded "that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property." The Court reasoned that "[t]o hold that injury caused by such [negligent] conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." *Id.* at 332, 106 S.Ct. 662.

By ruling in *Daniels* that a negligent act could not amount to a constitutional deprivation, the Court overruled *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), and clearly articulated that a finding of intentional conduct was a prerequisite for a due process claim. *See Daniels,* 474 U.S. at 330–31, 106 S.Ct. 662. Although *Daniels* was not a voting case, this Court's own cases support the application of the *Daniels* holding to the election context. In *Powell v. Power,* 436 F.2d 84, 85–86 (2d Cir.1970), six voters in a Congressional primary sought a federal remedy for errors committed by state election officials in permitting a number of individuals to cast ballots who under state law were not qualified to vote. The plaintiffs brought suit under 42 U.S.C. § 1983, invoking, *inter alia,* the Due Process Clause of the Fourteenth Amendment. The Court found that "the due process clause and article I, section 2 offer no guarantee against errors in the administration of an election." *Id.* at 88.

More than a quarter-century later, in *Gold,* we reaffirmed *Powell*'s holding and specifically rejected the argument that "'the requirement of willfulness' established by *Powell*" was no longer necessary to support a due process claim. 101 F.3d at 801. To the contrary, we were careful to note that "*Powell* continues to be the law of this Circuit, binding upon both the

district court and us, and can only be overruled by this Court sitting *in banc* or by a decision of the Supreme Court." *Id.*

In *Gold,* New York voters brought an action under 42 U.S.C. § 1983 claiming that they were denied the right to vote in a state primary election in Kings County because of election irregularities, including delays in the arrival of voting machines at approximately one-third of the election districts, miscounting of votes resulting from improper placement of templates over ballots, and the presence of ineligible candidates on the ballot. *Id.* at 798–800. This Court held that, where there was no intentional conduct by the state actors, "the election irregularities at issue do not constitute constitutional violations actionable under § 1983." *Id.* at 802. This Court found that "plaintiffs who can establish nothing more than 'unintended irregularities' in the conduct of elections are barred from obtaining § 1983 relief in federal court, *provided an adequate and fair state remedy exists.*" *Id.* at 800 (emphasis in original).

Appellees and the district court misconstrue this language in *Gold* to mean that, if no adequate and fair state remedy exists, they can establish a due process violation even in the absence of intentional conduct. There is no basis for that view. First, *Gold* does not turn on the adequacy of a state remedy. Although the panel mentioned the state remedy in a short paragraph near the end of the opinion, *id.* at 802, that was mere dicta. The holdings of *Powell* and *Daniels* controlled the *Gold* decision and, indeed, *Gold* reaffirmed that "more than negligent conduct by the state actor is needed in order for a cognizable § 1983 claim to exist based on violations of the due process clause." *Id.* at 800. Second, it would have been impossible for *Gold* to establish that an inadequate remedy in the absence of intentional state conduct is an independent ground for a due process violation because such an interpretation would be in direct conflict with the Supreme Court's holding in *Daniels* that negligent state conduct cannot violate the Due Process Clause.

Judge Learned Hand instructed that "[w]ords are not pebbles in alien juxtaposition ...." *NLRB v. Federbush Co.,* 121 F.2d 954, 957 (2d Cir.1941). Appellees take the "adequate and fair state remedy" language out of context by viewing it as an independent ground to establish a due process violation. Given the factual setting of *Gold* and the clarity of Supreme Court precedent, *Gold* could not have created independent grounds for federal court intervention where no due process violation exists.

Finally, Judge Oakes's concurrence in *Gold* leaves no doubt that the Court intended to uphold the intentional conduct requirement of *Powell* and *Daniels:*

I concur, bound as I am by the precedent of *Powell v. Power,* 436 F.2d 84 (2d Cir.1970), although the irregularities here were so gross as to call the flat statements in that precedent into serious question. However, to erode *Powell,* even in cases as fraught with irregularity as these, would put the federal courts in the extremely difficult position of monitoring state primaries as to the extent of election law violations, cases which would involve serious time constraints, difficult questions of cause and effect, and extremely complicated questions of remedy, including whether to order a reelection overall or only in certain districts, etc. Thus, though I was initially inclined to agree with District Judge Trager that the facts of these cases and the related cases went beyond the bounds of simple irregularity, on further reflection *they still fall short of the intentional deprivation called for* by

*Powell* and progeny. Therefore, I am required, reluctantly, to concur.

101 F.3d at 803 (emphasis added). Our colleague reiterated this Court's continued adherence to *Powell* and the necessity for an *intentional* deprivation of a constitutional right as a precondition to federal intervention. Thus, *Gold* reaffirmed that plaintiffs must prove an intentional act in order to show a due process violation.

Without question, courts have found due process violations in voting cases before, but each case involved an intentional act on the part of the government or its officials. *See, e.g., Griffin v. Burns,* 570 F.2d 1065, 1078–79 (1st Cir.1978); *Briscoe v. Kusper,* 435 F.2d 1046 (7th Cir.1970). Infringements of voting rights that have risen to the level of constitutional violation include: dilution of votes by reason of malapportioned voting districts or weighted voting systems, *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); purposeful or systematic discrimination against voters of a certain class, *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965), geographic area, *Moore v. Ogilvie,* 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), or political affiliation, *Shakman v. Democratic Org. of Cook County,* 435 F.2d 267 (7th Cir.1970); and other willful conduct that undermines the organic processes by which candidates are elected, *see, e.g., Smith v. Cherry,* 489 F.2d 1098 (7th Cir.1973). *See Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975) (collecting cases). Each required intentional state conduct directed at impairing a citizen's right to vote.

■ This case is different. At no point have appellees alleged that local officials acted intentionally or in a discriminatory manner with regard to the vote miscount. Both sides concede that the recorded results were likely due to an unforeseen malfunction with voting machine "A." A voting machine malfunction is the paradigmatic example of a "garden variety" election dispute. *See Griffin,* 570 F.2d at 1076. "In general, garden variety election irregularities do not violate the Due Process Clause, even if they control the outcome of the vote or election." *Bennett v. Yoshina,* 140 F.3d 1218, 1226 (9th Cir.1998). Examples of such "garden variety" irregularities as identified by the federal courts include: malfunctioning of voting machines, *Hennings,* 523 F.2d at 864; human error resulting in miscounting of votes and delay in arrival of voting machines, *Gold,* 101 F.3d at 801–02; allegedly inadequate state response to illegal cross-over voting, *Curry,* 802 F.2d at 1316; mechanical and human error in counting votes, *Bodine v. Elkhart County Election Bd.,* 788 F.2d 1270, 1272 (7th Cir.1986); technical deficiencies in printing ballots, *Hendon v. North Carolina State Bd. of Elections,* 710 F.2d 177, 182 (4th Cir.1983); mistakenly allowing nonparty members to vote in a congressional primary, *Powell,* 436 F.2d at 85–86; and arbitrary rejection of ten ballots, *Johnson v. Hood,* 430 F.2d 610, 612–13 (5th Cir. 1970). *See Bennett,* 140 F.3d at 1226 (collecting cases). Although this election was of unquestioned importance to the people of Whitestown, the matter before the district court—a malfunctioning voting machine that simply failed to register votes on one of the lines—is an unfortunate but unintended irregularity, and as such, differs significantly from purposeful state conduct directed at disenfranchising a class or group of citizens.

■■ The district court below premised its finding of a due process violation on its determination that quo warranto, the available state remedy, was "inadequate and unfair." *Shannon,* 2004 WL 180253, at *2. A quo warranto proceeding is available under New York law to chal-

lenge title to a public office. N.Y. Exec. Law § 63-b. The New York Court of Appeals has noted that it is the "proper vehicle for challenging the results" in the case of a voting machine malfunction.[4] *Delgado v. Sunderland*, 97 N.Y.2d 420, 423, 741 N.Y.S.2d 171, 767 N.E.2d 662 (2002).

█ The district court's evaluation of the fairness and adequacy of the quo warranto process was unnecessary. Courts may consider the adequacy and fairness of the state remedy *only after* they first conclude that the due process clause is implicated by intentional state action. *See Daniels*, 474 U.S. at 328, 106 S.Ct. 662. Because plaintiffs have not alleged intentional conduct on the part of the Board of Elections or its officials, we need not reach the "fair and adequate" question here.

To affirm the decision of the lower court would be to invite federal intervention into every negligent disruption of a local election. We find it appropriate to once again echo the words of caution this Court expressed in *Powell*:

> Were we to embrace plaintiffs' theory, this court would henceforth be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registra-

tion cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law. Absent a clear and unambiguous mandate from Congress, we are not inclined to undertake such a wholesale expansion of our jurisdiction into an area which, with certain narrow and well defined exceptions, has been in the exclusive cognizance of the state courts.

436 F.2d at 86. That is especially true in this case where there was no intentional discrimination or deprivation of the right to vote, where our own case law indicates that there is no due process violation, and where a state law remedy exists but plaintiffs refused to test it.[5] Because no conduct is alleged that would indicate an intentional deprivation of the right to vote, we find no cognizable federal due process claim.

### Conclusion

Accordingly, the district court's order of January 27, 2004 granting summary judgment is hereby REVERSED and its injunctions VACATED. We REMAND this case for proceedings consistent with this opinion.

---

**4.** "Challenges to the outcome of a general election based upon alleged voting machine malfunctions necessarily fall within the purview of quo warranto." *Delgado*, 97 N.Y.2d at 424, 741 N.Y.S.2d 171, 767 N.E.2d 662. In the case of a machine malfunction,

> the proper vehicle for challenging the results and contesting title to the public office of the purported winner is a quo warranto action, now codified in Executive Law § 63-b. The power to commence a quo warranto action is vested in the Attorney General, to be used only after the alleged "usurper" has taken office. In exercising this power, the Attorney General performs an investigative and screening function on such challenges, and is presumed to afford

a claimant a full opportunity to assert a legal right, if any exists. The exclusivity of quo warranto in these circumstances also avoids the risk of leaving the contested office vacant for possibly a protracted period while the election result is being litigated through the courts to a final conclusion. *Id.* at 423–24, 741 N.Y.S.2d 171, 767 N.E.2d 662 (internal citations omitted).

**5.** *See also Delgado*, 97 N.Y.2d at 425, 741 N.Y.S.2d 171, 767 N.E.2d 662 (leaving open the possibility that "a declaratory judgment might lie as an alternative remedy where quo warranto has ceased to be available to the aggrieved candidate because the Attorney General has declined to act").