**Verena RIVERA–POWELL, Francesca Castellanos, Georgina Sanchez, and Marie Sierra, Plaintiffs–Appellants,**

v.

**NEW YORK CITY BOARD OF ELECTIONS, Defendant–Appellee.**

**Docket No. 06–4665–CV.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 18, 2006.

Decided: Dec. 5, 2006.

Stephen T. Mitchell, New York, NY, for plaintiffs-appellants.

Scott Shorr, City of New York Law Department (Michael A. Cardozo, Corporation Counsel of the City of New York, on the brief; Barry P. Schwartz, Stephen Kitzinger, of counsel), New York, NY, for defendant-appellee.

Before JACOBS, Chief Judge,
KEARSE and SOTOMAYOR, Circuit Judges.

SOTOMAYOR, Circuit Judge.

Plaintiffs-appellants Verena Rivera–Powell, who seeks to be a candidate for

judge of the Civil Court of the City of New York, and voters who support her candidacy (the "voter-plaintiffs") (collectively, "plaintiffs") appeal from an October 4, 2006 order of the United States District Court for the Southern District of New York (Buchwald, J.), *Rivera–Powell v. N.Y. City Bd. of Elections,* No. 06–6843, 2006 WL 2850212 (S.D.N.Y. Oct.4, 2006), denying their motion for a preliminary injunction and dismissing their complaint. Defendant-appellee New York City Board of Elections (the "Board") removed Rivera–Powell from the ballot on the basis of a voter's written objection to her candidacy. Seeking to be reinstated to the ballot, Rivera–Powell filed this action pursuant to 42 U.S.C. § 1983 (2000), asserting that the objection was untimely filed and that in entertaining it, the Board acted contrary to New York election law. She claims that this allegedly unauthorized conduct deprived her and her co-plaintiffs of procedural due process in violation of the Fourteenth Amendment and infringed on their freedom of association and voting rights in violation of the First Amendment. She also alleges that the Board removed her from the ballot because of her race. We hold that because the state provided Rivera–Powell with a pre-deprivation hearing and an adequate judicial procedure by which to challenge any alleged illegalities in the Board's action, Rivera–Powell and her co-plaintiffs have failed to state violations of their procedural due process and First Amendment rights. We also find Rivera–Powell's equal protection claim without merit because the only allegation of racial discrimination is conclusory.[1]

## BACKGROUND

Rivera–Powell sought to become the Democratic party nominee for judge of the Civil Court of the City of New York in the 7th Municipal District. To be placed on a party's primary ballot, New York law requires an individual to submit a "designating petition" meeting certain formal requirements. *See* N.Y. Elec. Law §§ 6–130 to –136 (McKinney 1998). A designating petition comprises "petition volumes" (bound groupings of sheets bearing the signatures of registered voters), each with an identification number, and a "cover sheet," which contains a variety of information including the identification numbers of the petition volumes the candidate is claiming. *See* Board of Elections in the City of New York, *Designating Petition and Opportunity to Ballot Petition Rules for the September 12, 2006 Primary Election,* Rule C2 & Definitions (May 9, 2006), http://vote.nyc.ny.us./pdf/documents/boe/2006primaryelection /2006designatingotbrules.pdf ("Board Rules").[2] A petition for an office elected by the voters of a municipal court district must contain no fewer than 1,500 signatures. New York State Board of Elections, *Official Political Calendar 2006* (Mar.2006), http://www.elections.state.n y.us/NYSBOE/law/2006_OFFICIAL_calendar.pdf; *see also* N.Y. Elec. Law § 6–136(2)(c) (McKinney 1998).

On Tuesday, July 11, 2006, Rivera–Powell filed her designating petition with the Board. Rivera–Powell's petition volumes

---

1. The Board maintains that it was not properly served a copy of the summons along with the plaintiffs' complaint, in violation of Federal Rule of Civil Procedure 4(c)(1), and as a result, the district court had no personal jurisdiction over it. The district court found otherwise and asserted personal jurisdiction, *Rivera–Powell,* 2006 WL 2850212, at *3, and the

Board has offered no compelling reason for why that ruling is erroneous.

2. The term "petition" refers to the entirety of the documentation filed with the Board designating a candidate for office. *See* Board Rules at 1.

consisted of so-called *Popkin* petitions, which collect signatures on behalf of more than one candidate; some signatures are eligible to support only one candidate, others to support more than one.[3] Her cover sheet claimed the six petition volumes with identification numbers ending in 206, 208, 210, 212, 214 and 216. Rivera–Powell estimated that the petition volumes contained roughly 3900 signatures; only some of these, however, were from individuals who resided in the proper district to support her candidacy.

On Thursday, July 13, 2006, a *Popkin* petition volume in the same numerical series and ending in 218 was filed with the Board. Petition volume 218, like volumes 206 through 216, listed Rivera–Powell's name as one of the candidates it supported, though Rivera–Powell had not claimed volume 218 on her July 11 cover sheet. Under prior Board practices, if the Board received a petition volume without a designating cover sheet (a "stray" petition), it automatically removed the candidate from the ballot, notified the candidate of the stray petition and offered him or her an opportunity to claim the petition by filing an amended cover sheet. If the candidate filed the amended cover sheet or affirmatively disclaimed the petition, he or she would be reinstated and the stray petition either attributed to the candidacy or ignored, as the candidate had chosen. Two years ago, however, the Board "liberalized" its practices. Currently, the Board automatically attributes a stray petition to the named candidate's application immediately upon receipt, while maintaining the candidate on the ballot. Within several days, the Board sends a letter to the candidate giving him or her three days in which affirmatively to claim the petition by filing an amended cover sheet; if the candidate affirmatively disclaims or does nothing, the Board does not attribute the petition to the candidate. The critical difference between the old and new practices is that currently, during the interval between the filing of the stray petition and the expiration of the three-day claim period, the Board's public records attribute the stray petition volume to the candidate. Thus, when volume 218 was submitted on July 13, the Board immediately attributed it to Rivera–Powell, and consistent with normal practice updated its public records database to reflect that the most recent petition volume filed for Rivera–Powell's candidacy was received July 13. On July 25, the Board sent her a letter informing her of the filing of volume 218, and giving her three business days in which to file an amended cover sheet if she wished to claim it. Because she did not respond within the specified period, the Board removed volume 218 "from any consideration of any matter relating to" her candidacy and updated the database accordingly.

Under New York Election Law section 6–154, a general objection must be filed "within three days after the filing of the petition ... to which objection is made."[4] N.Y. Elec. Law § 6–154(2) (McKinney

---

3. The petitions are so named because they are authorized by the New York Supreme Court, Appellate Division decision *Popkin v. Umane*, 22 A.D.3d 613, 801 N.Y.S.2d 774 (2d Dep't 2005). The candidates listed on a single *Popkin* petition need not be candidates for offices elected from identical geographic areas. As a result, a given signature may be geographically eligible to support candidates running in the signer's district of residence or running

citywide, but not candidates running in other districts.

4. A general objection merely identifies the petition to which it objects. Board Rule G. Within six days of filing the general objection, the objector must file a specification of objection, setting forth factual allegations supporting the objection or supplying reasons why particular signatures should be found invalid. Board Rule H.

1998). The Board Rules state more specifically that "[t]he last day for filing general objections shall be three days after the latest date on which any part of such petition or cover sheet was filed." Board Rule G1. On July 17, three days after the filing of petition volume 218 (excluding a Sunday, which otherwise would have been the third day), but six days after Rivera–Powell filed her original petition, Franklin Hess, a registered voter in the 7th Municipal District, filed a general objection to Rivera–Powell's petition.

On August 3, the Board met to consider, *inter alia*, Hess' challenge to Rivera–Powell's candidacy. In response to Hess' objection, the clerk of the Board had counted the signatures in the petition volumes Rivera–Powell claimed on her July 11 cover sheet (i.e., 206, 208, 210, 212, 214 and 216, but not 218) and found that she was 71 signatures short of the required 1,500 signatures. Rivera–Powell's counsel was present at the meeting and objected that Hess's challenge was untimely. Because Rivera–Powell neither claimed petition volume 218 on her original cover sheet nor filed an amended cover sheet to claim it, her counsel argued, her documentation was complete on July 11, and any objection to it had to be filed by July 14.[5] Hess's counsel countered that Hess had reasonably relied on the information in the Board's public records (which until July 28 indicated that July 13 was the last day that a part of Rivera–Powell's petition, the stray petition, was filed) in order to calculate July 17 as the final date to file an objection.

In considering the timeliness question, Board Chairman Frederic Umane noted that the circumstances presented "an interesting conundrum because if we rule one way, one side is unfairly punished based on these Popkin [sic] type petitions and if we rule the other way the other side's unfairly prejudiced." In other words, if the Board ruled the objection timely, it could unfairly prejudice the candidate, who might have had nothing to do with the filing of the stray petition, but if it ruled the objection untimely, it could unfairly prejudice the objector, who had no way of knowing that the date reflected in the public record was not in fact the last day that a part of the candidate's petition was filed. Umane also noted that either decision would open up the system to maneuvering—either by objectors, who could file petitions "on behalf of the candidate they're going to be objecting to [in order] to extend they're [sic] time by 3 days in order to be able to file objections," or by candidates, who "could do the same thing—they could file an extra petition and giv[e] false hope to objectors" by making them think, "ah, I have an extra 3 days." It appears from the record that the Commissioners believed the question of the objection's validity to be pending before the New York Supreme Court,[6] and so, without explicitly resolving the "conundrum" Chairman Umane had identified,

---

5. Rivera–Powell's counsel did not challenge the substance of the clerk's report, for example, by arguing that certain eliminated signatures were in fact valid.

6. Hess's counsel stated at the August 3 meeting that "[t]hese issues are before the Supreme Court." It appears from the public record, *see Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir.2000) (stating that the court may take judicial notice of court documents), that Hess's counsel must have been referring to the action Hess had already filed to challenge Rivera–Powell's candidacy, *Hess v. N.Y. City Bd. of Elections*, Index No. 110081/06 (N.Y.Sup.Ct. July 20, 2006), and not to Rivera–Powell's own action, which she did not commence until the following day, *see* Docket, *Powell v. N.Y. City Bd. of Elections*, Index No. 1110989/06 (N.Y.Sup.Ct. Aug. 9, 2006) (indicating that the index number was purchased August 4, 2006).

they voted to approve the clerk's report, thereby removing Rivera–Powell from the ballot.

To contest her removal, Rivera–Powell instituted a special action in New York Supreme Court pursuant to New York Election Law section 16–102, which provides for expedited "proceedings as to designations and nominations." N.Y. Elec. Law § 16–102 (McKinney 1998). The court dismissed the action for lack of jurisdiction, however, *Powell v. N.Y. City Bd. of Elections,* Index No. 1110989/06 (N.Y.Sup.Ct. Aug. 9, 2006), because the complaint, though notarized, was not verified as New York Election Law section 16–102 requires. Rivera–Powell did not appeal the dismissal. Instead, on September 9, she brought this suit under 42 U.S.C. § 1983, alleging violations of her First and Fourteenth Amendment rights. She subsequently amended her complaint by, *inter alia,* adding as plaintiffs voters who support her candidacy. After conducting an evidentiary hearing, the district court concluded that the Board's action was "consistent with state law and well within the Board's delegated authority," and that as a result, Rivera–Powell's due process, equal protection, and First Amendment claims "necessarily fall." *Rivera–Powell,* 2006 WL 2850212, at *5. The court therefore issued an order denying injunctive relief and dismissing the complaint. Rivera–Powell timely appealed, and on October 18, 2006, the last day on which the Board could add Rivera–Powell's name to the ballot in time for the 2006 election, we issued an order affirming the district court's judgment. We now write to explain our reasoning.

## DISCUSSION

Rivera–Powell argues that because neither her initial cover sheet nor any amended cover sheet ever claimed stray volume 218, that volume could not properly be considered part of her petition, which therefore had to be deemed complete as of July 11, 2006. As a result, any objections had to be filed by July 14, three days before Hess's objection was filed, in order to be considered timely. In entertaining Hess's untimely objection and removing her from the ballot, she argues, the Board acted contrary to New York election law, thereby depriving her of access to the ballot without procedural due process. She contends that this same unauthorized deprivation amounted to a denial of her and the voter-plaintiffs' associational and voting rights in violation of the First Amendment. Finally, she alleges that the Board's action was racially motivated, and so denied her equal protection of the laws. For the reasons to be discussed, we conclude that the plaintiffs—regardless of whether the Board's action was consistent with state law, a question we do not reach—have not stated any constitutional violation. We hold that because the state provided Rivera–Powell with a pre-deprivation hearing and an adequate judicial procedure by which to challenge any alleged illegalities in the Board's action, Rivera–Powell and her co-plaintiffs have failed to state violations of their procedural due process and First Amendment rights. We also find that their equal protection claim lacks merit because the only allegation of racial discrimination is conclusory.

### I. *Due Process Claim*

The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, "only against deprivations without due process of law." *Parratt v. Taylor,* 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (internal quotation marks omitted), *overruled in part on other grounds by Daniels v. Williams,*

474 U.S. 327, 330–31, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). "[T]o determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate." *Zinermon v. Burch,* 494 U.S. 113, 126, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990).

■■■ As we explained in *Hellenic American Neighborhood Action Committee v. City of New York ("HANAC"),* in evaluating what process satisfies the Due Process Clause, "the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." 101 F.3d 877, 880 (2d Cir.1996) (citing *Hudson v. Palmer,* 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and Parratt, 451 U.S. at 541, 101 S.Ct. 1908). When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy. *Id.; see Hudson,* 468 U.S. at 533, 104 S.Ct. 3194 (explaining that when deprivations are "random and unauthorized . . . predeprivation procedures are simply impracticable since the state cannot know when such deprivations will occur" (internal quotation marks omitted)). In contrast, when the deprivation is pursuant to an established state procedure, the state can predict when it will occur and is in the position to provide a pre-deprivation hearing. *HANAC,* 101 F.3d at 880; *Parratt,* 451 U.S. at 541, 101 S.Ct. 1908. Under those circumstances, "the availability of post-deprivation procedures will not, *ipso facto,* satisfy due process." *HANAC,* 101 F.3d at 880.[7]

The distinction between random and unauthorized conduct and established state procedures, however, is not clear-cut. In *Zinermon v. Burch,* the Court held that government actors' conduct cannot be considered random and unauthorized within the meaning of *Parratt* if the state delegated to those actors "the power and authority to effect the very deprivation complained of . . . [and] the concomitant duty to initiate the procedural safeguards set up by state law," even if the act in question "was not . . . sanctioned by state law." 494 U.S. at 138, 110 S.Ct. 975. This court has since relied on *Zinermon* to hold that the acts of high-ranking officials who are "ultimate decision-maker[s]" and have "final authority over significant matters," even if those acts are contrary to law, should not be considered "random and unauthorized" conduct for purposes of a procedural due process analysis. *Velez v.*

<hr/>

**7.** We note that both of these situations address *intentional* deprivations of due process, not negligent ones. The Board argues that its action was merely negligent, and so cannot be found to violate due process. *See Daniels,* 474 U.S. at 328, 106 S.Ct. 662 (holding the Due Process Clause is not implicated by negligent government action); *see also Gold v. Feinberg,* 101 F.3d 796, 800 (2d Cir.1996) (finding that "unintended irregularities" in the conduct of elections are not violations of § 1983 when an adequate and fair state remedy exists). The Board's removal of Rivera–Powell, however, was clearly an intentional act. To the extent that our prior case law has suggested that in order to consider election officials' conduct "intentional" the officials

must have the intent actually to interfere with the electoral process, *see Shannon v. Jacobowitz,* 394 F.3d 90, 96 (2d Cir.2005); *Gold,* 101 F.3d at 801–02, we wish to clarify that that is not the case. *Shannon* and *Gold,* which dealt with inadvertent election irregularities such as voting machine malfunctions, were not addressed to a situation like the one presently before us, where plaintiffs challenge the decision of a government body. Such a decision amounts to intentional, as opposed to negligent, action regardless of whether the actors' intent was wrongful. The question in the present case is not whether the action was intentional, which it clearly was, but rather whether it was accompanied by appropriate process.

*Levy,* 401 F.3d 75, 91–92 & nn. 14 & 15 (2d Cir.2005) (internal quotation marks omitted); *see also DiBlasio v. Novello,* 344 F.3d 292 (2d Cir.2003).

The Board argues that the present case is controlled by *HANAC,* which addressed a contractor's claim that city officials had *de facto* debarred it from contracting with the City of New York "in flagrant violation" of the City Charter and city agency rules. 101 F.3d at 881. Finding that the officials' actions were "random and arbitrary," rather than pursuant to established state procedures, and that there existed a "perfectly adequate postdeprivation remedy"—an Article 78 proceeding, *see* N.Y.C.P.L.R. § 7801 (McKinney 1998)— we held that the state had not deprived the plaintiff of a liberty or property interest without due process of law. 101 F.3d at 881–82.

In light of our jurisprudence on the meaning of "random and unauthorized," however, we are hesitant to accept the Board's argument. As we clarified in *DiBlasio,* our determination in *HANAC* that the state action was random and unauthorized turned on the fact that the contracts officer who effected the deprivation did not have "final authority over significant matters." 344 F.3d at 303 n. 3 (internal quotation marks omitted). Here, by contrast, the Board of Elections has been delegated the authority to make the kind of deprivation at issue here—the removal of candidates from the ballot. *See* N.Y. Elec. Law § 6–154.[8]

■ Ultimately, however, the question of how to classify the Board's action is immaterial, and so we do not decide it. If we were to determine that the Board's conduct was random and unauthorized,

bringing it within *HANAC,* the existence of a meaningful post-deprivation remedy (which New York has provided in this case, as we discuss below) would automatically satisfy procedural due process. *See HANAC,* 101 F.3d at 880. If, on the other hand, we were to find that the Board's decision was part of an established state procedure, such that the availability of a post-deprivation remedy would not *automatically* satisfy due process, we would merely go on to determine what process was due. *See Locurto v. Safir,* 264 F.3d 154, 172 (2d Cir.2001). This we do by balancing the following three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Under the *Mathews* test, we reach the same conclusion as we would reach under *HANAC,* namely, that the process provided to Rivera–Powell was adequate.

■ First, Rivera–Powell received at least some form of pre-deprivation hearing on August 3, when the Board considered Hess's objection. Though the parties did not brief this issue, the record suggests that this hearing afforded her notice and an opportunity to be heard; indeed, Rivera–Powell's attorney appeared at the hearing and voiced her position. Case law

---

8. Moreover, to the extent that the purpose of the *Parratt–Hudson* inquiry is to determine whether the government actor could have provided pre-deprivation process, that question must clearly be answered in the affirmative here, because the Board actually conducted a hearing before voting on Rivera–Powell's candidacy.

in analogous contexts suggests that such a hearing meets the essential requirements of due process. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 545–46, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (stating in the employment context that a pre-termination hearing "need not be elaborate" so long as it provides "[t]he essential requirements of due process," which are "notice and an opportunity to respond"). More importantly, after the Board's action, Rivera–Powell had the opportunity to obtain full judicial review by way of a special proceeding under New York Election Law section 16–102, which provides for expedited proceedings as to designations.[9] The combination of these two procedures satisfies due process. *See Locurto,* 264 F.3d at 173–75 (finding that, when terminated employees alleged that the administrative procedures leading to their termination were biased and contrary to law, due process was satisfied by a "minimal" hearing followed by a "wholly adequate post-deprivation" Article 78 hearing); *N.Y. State NOW v. Pataki,* 261 F.3d 156, 168–69 (2d Cir.2001) (requiring courts to consider the availability of Article 78 proceedings in determining whether the state has provided procedural due process); *see also Loudermill,* 470 U.S. at 547–48, 105 S.Ct. 1487 (concluding in the employment context that "all the process that is due is provided by a pretermination opportunity to respond, coupled with post-termination administrative procedures as provided by [state] statute"); *Bello v. Walker,* 840 F.2d 1124, 1128 (3d Cir.1988) ("[A] state provides adequate due process when it provides reasonable remedies to rectify a legal error by a local administrative body." (internal quotation marks omitted)), *overruled on other grounds by UA Theatre Circuit v. Twp. of Warrington,* 316 F.3d 392, 394 (3d Cir.2003). Because we would find that the state provided due process regardless of whether we found the Board's action to be random and unauthorized or an established state procedure, we decline to decide the issue.[10] *See Locurto,* 264 F.3d at 173 (declining to "foray further into th[e] legal thicket" of the same question "absent some real need to address" it, and finding that the state had provided due process regardless of how the chal-

---

**9.** Rivera–Powell was clearly aware of this remedy, as she commenced—though ultimately did not pursue—such an action challenging the Board's removal of her name from the ballot. The fact that Rivera–Powell failed properly to pursue the state court action, and that it is now too late to do so, does not affect our due process analysis: had she appealed the dismissal of her petition, the state courts would have had an opportunity to clarify when a verified petition is in fact required, *compare Rose v. Smith,* 220 A.D.2d 922, 633 N.Y.S.2d 218, 220 (N.Y.App.Div.1995) (holding that courts need not dismiss section 16–102 actions for failure to verify absent any showing of prejudice), *with O'Connell v. Ryan,* 112 A.D.2d 1100, 493 N.Y.S.2d 230, 231 (N.Y.App.Div.1985) (per curiam) (holding that because the verification requirement was jurisdictional in nature, dismissal was required), and could have decided to accord Rivera–Powell the process she now seeks. Where a state law remedy gives a party "a meaningful opportunity to challenge" the state's action, "he [is] not deprived of due process simply because he failed to avail himself of the opportunity." *Giglio v. Dunn,* 732 F.2d 1133, 1135 (2d Cir.1984).

**10.** Similarly, we need not address the question of when in the course of a candidate's removal from the ballot the constitutional "deprivation" occurs—immediately after the Board's vote, or only on election day, if the candidate has still not been reinstated. This influences whether section 16–102 proceedings should properly be considered "pre-deprivation" or "post-deprivation" remedies. However, the distinction is irrelevant because our holding (that the combination of a Board of Elections hearing and state court judicial review provide adequate process) does not depend on whether the state court review is considered pre-deprivation or post-deprivation.

lenged action was classified). For this reason, Rivera–Powell's due process claim fails. Her co-plaintiffs' claim also fails, as they have alleged no deprivation independent of Rivera–Powell's. Thus, because the Board's action does not rise to the level of a constitutional violation with regard to Rivera–Powell, it does not rise to such a level with regard to the voters.[11]

## II. First Amendment Claims

■ Having found that Rivera–Powell has not stated a valid due process claim, we turn to her argument that the Board's action has infringed her and the voter-plaintiffs' First Amendment rights to organize, access the ballot, and vote for the candidate of their choice. *See Anderson v. Celebrezze*, 460 U.S. 780, 787, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (describing the " 'two different, although overlapping, kinds of rights' " that ballot access restrictions burden: " 'the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively' " (quoting

*Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968))); *López Torres v. N.Y. State Bd. of Elections*, 462 F.3d 161, 183–84 (2d Cir.2006) (explaining that the First Amendment protects the rights *Anderson* identified). Unlike her due process claim, Rivera–Powell's First Amendment claim is not automatically defeated by a finding that the state provided adequate process. *See Wilbur v. Harris*, 53 F.3d 542, 544 (2d Cir.1995) (distinguishing procedural due process claims under § 1983, which "require analysis of state remedies," from First Amendment claims, which do not).[12]

■ Under the facts of this case, however, Rivera–Powell's First Amendment claim is virtually indistinguishable from her due process claim, in that she alleges no additional deprivation of her First Amendment interests independent from the deprivation that forms the basis of her due process claim. She does not challenge the state's law restricting ballot access to those who garner a sufficient number of signatures[13] or the law specifying require-

---

**11.** The Supreme Court has analyzed the rights of candidates and the rights of voters as a single inquiry in the First Amendment context, *see Cook v. Gralike*, 531 U.S. 510, 531, 121 S.Ct. 1029, 149 L.Ed.2d 44 (2001) (stating that the Supreme Court's ballot access cases "have rarely distinguished between the rights of candidates and the rights of voters") (Rehnquist, C.J., concurring); *Anderson v. Celebrezze*, 460 U.S. 780, 786, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation . . . ." (internal quotation marks omitted)), and in our own election cases addressing the due process rights of both candidates and their supporters, we have analyzed the two types of parties' claims in a single inquiry without comment, *see Shannon*, 394 F.3d at 91, 97 (describing plaintiffs as candidate and voters, and finding that they had not stated a due process claim); *Gold*, 101 F.3d at 799, 802 (same).

**12.** The general rule is that § 1983 claims, including First Amendment claims, do not require exhaustion of state remedies. *See Patsy v. Bd. of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). When § 1983 claims allege procedural due process violations, we nonetheless evaluate whether state remedies exist because that inquiry goes to whether a constitutional violation has occurred at all. " 'Exhaustion *simpliciter* is analytically distinct from the requirement that the harm alleged has occurred. Under the jurisprudence, a procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.' " *N.Y. State NOW v. Pataki*, 261 F.3d 156, 169 (2d Cir.2001) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir.2000)).

**13.** *See* N.Y. Elec. Law § 6–136(2)(c) (McKinney 1998) (establishing the number of signa-

ments for objections,[14] limitations that she appears to accept as reasonable. *See Burdick v. Takushi*, 504 U.S. 428, 440 n. 10, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) ("[L]imiting the choice of candidates to those who have complied with state election law requirements is the prototypical example of a regulation that, while it affects the right to vote, is eminently reasonable.").[15] Neither does she contend that the Board's published Rules regarding the submission of petitions or the filing of objections violate her rights in any respect. Rather, she claims that in accepting Hess's objection as timely when, under her reading of the statute and Board Rules, the unclaimed volume was not a part of her petition and had no bearing on the objection period, the Board applied these limitations illegally, and that keeping her from the ballot in such a manner improperly burdened her and the voter-plaintiffs' right to participate in the electoral process. In other words, her First Amendment claim is inextricably intertwined with the question of whether the state afforded her procedurally adequate process. As we discussed above, New York provided Rivera–Powell appropriate opportunities to challenge the Board's allegedly improper conduct in the form of an initial hearing and full judicial review. When, as here, a plaintiff challenges a Board of Election decision not as stemming from a constitu-

tionally or statutorily invalid law or regulation, but rather as contravening a law or regulation whose validity the plaintiff does not contest, there is no independent burden on First Amendment rights when the state provides adequate procedures by which to remedy the alleged illegality. *See supra* note 12.

We note that a contrary holding would permit any plaintiff to obtain federal court review of even the most mundane election dispute merely by adding a First Amendment claim to his or her due process claim. We would thereby undermine our holding—one which we share with many other circuits [16]—that federal court intervention in "garden variety" election disputes is inappropriate. *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir.2005) (describing the case as presenting a "paradigmatic example of a garden variety election dispute" which does not violate the Due Process Clause) (internal quotation marks omitted); *see Powell v. Power*, 436 F.2d 84, 86 (2d Cir.1970) (warning against federal courts' "be[ing] thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitions, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law"). We therefore hold that when a candidate raises a First Amend-

---

tures required for a New York City office "to be filled ... by all the voters of any municipal court district").

**14.** *See* N.Y. Elec. Law § 6–154.

**15.** As the Supreme Court has recognized, candidates' and voters' associational and voting rights are qualified ones. *See Burdick*, 504 U.S. at 433, 112 S.Ct. 2059 (noting that although "voting is of the most fundamental significance under our constitutional structure .... [i]t does not follow ... that the right to vote in any manner and the right to associate for political purposes through the ballot

are absolute." (internal quotation marks and citations omitted)). Many restrictions, such as signature requirements, not only do not burden voters' constitutional rights to associate, but are, as a practical matter, necessary to ensure the orderly functioning of elections. *See Anderson*, 460 U.S. at 788, 103 S.Ct. 1564.

**16.** *See, e.g., Rossello–Gonzalez v. Calderon–Serra*, 398 F.3d 1, 14 (1st Cir.2004); *Siegel v. LePore*, 234 F.3d 1163, 1181 (11th Cir.2000); *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir.1998); *Hutchinson v. Miller*, 797 F.2d 1279, 1283 (4th Cir.1986).

ment challenge to his or her removal from the ballot based on the allegedly unauthorized *application* of an admittedly valid restriction, the state has satisfied the First Amendment if it has provided due process. Because, for the reasons discussed above, we find that Rivera–Powell's and her co-plaintiffs' due process claim fails, their First Amendment claim likewise fails.

### III.   *Equal Protection*

Rivera–Powell further argues that the Board's conduct denied her equal protection of the laws by denying her access to the ballot because of her race. She contends that the Board's allegedly "severe departure" from the rules governing objections can only indicate a racially biased motive. She contends that the Board members had reason to know that she was African–American despite the fact that she was not present at the August 3 hearing, and that they were aware of her Latino surname. In order to establish such a constitutional violation, Rivera–Powell would have to show that the Board intentionally discriminated against her, either by adopting out of racial animus policies which are facially neutral but have a racially discriminatory effect, or by applying a facially neutral policy in a racially discriminatory manner. *See Hayden v. County of Nassau,* 180 F.3d 42, 48 (2d Cir.1999); *see also Powell v. Power,* 436 F.2d at 88 (requiring a showing of "intentional or purposeful discrimination" to make out an equal protection claim in the election context). However, the Board changed its practices regarding attribution of stray petitions well before Rivera–Powell's candidacy was before them. Hence the practice itself could not have been motivated by racial bias towards her, and plaintiffs have not suggested that any generalized racial animus inspired it, nor plausibly could they do so. To the extent that Rivera–Powell argues that the Board's

particular treatment of her candidacy in light of its pre-existing policy was motivated by bias, this claim is unsubstantiated. Rivera–Powell's complaint proffers only a conclusory allegation of discrimination, which, " 'without evidentiary support or allegations of particularized incidents, does not state a valid claim' " and so cannot withstand a motion to dismiss. *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir. 1996) (quoting *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990)). There is nothing in the record of the Board's meeting to suggest that race played a role in its decision, and the district court's evidentiary hearing on Rivera–Powell's motion for a preliminary injunction brought to light no additional evidence tending to support that view. *See Rivera–Powell,* 2006 WL 2850212, at *5 n. 17 ("[T]here was absolutely no evidence, direct or circumstantial, of intentional discrimination."). We therefore affirm the district court's dismissal of Rivera–Powell's equal protection claim.

### CONCLUSION

We have observed that "[o]nly in extraordinary circumstances will a challenge to a state . . . election rise to the level of a constitutional deprivation." *Shannon,* 394 F.3d at 94 (internal quotation marks omitted). This case presents no such circumstances.

Because New York removed Rivera–Powell from the ballot pursuant to constitutionally adequate procedures, including judicial review of the Board's allegedly unauthorized conduct, we find that she and her co-plaintiffs have stated no valid due process or First Amendment claims. We also reject her equal protection claim, which is based only on conclusory allegations. All three challenges would fail even if the Board's consideration of the objection were inconsistent with New York

Election Law section 6–154 and the Board Rules, and so we do not reach the substantive question of whether its decision to remove Rivera–Powell from the ballot was authorized. The judgment of the district court dismissing plaintiffs' complaint and denying their motion for a preliminary injunction is AFFIRMED.